UNITED STATES BANKRUPTCY COURT                    <u>FOR PUBLICATION</u>
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re

      STERLING UNITED, INC.                         Case No. 13-11351 K

                         Debtor
-----------------------------------------------------------------
JOHN H. RING III, Trustee of the
Chapter 7 Bankruptcy Estate of
STERLING UNITED, INC.

                         Plaintiff

        -vs-                                      AP No. 14-1017 K

FIRST NIAGARA BANK, N.A.

                        Defendant
-----------------------------------------------------------------


Arthur G. Baumeister, Esq.
Amigone, Sanchez, Mattrey & Marshall
Main Place Tower
350 Main Street
Buffalo, NY   14202

Attorney for Trustee/Plaintiff

Garry M. Graber, Esq.
Craig T. Lutterbein, Esq.
Hodgson Russ LLP
140 Pearl Street, Suite 100
Buffalo, NY   14202

Attorneys for Defendant

This Adversary Proceeding was commenced by the Chapter 7 Trustee on March 20, 2014, alleging avoidable preferential transfers to the Defendant, pursuant to 11 U.S.C. § 547(b).[1]  The Trustee seeks to recover more than $300,000 in payments made by the Debtor, and also more than $300,000 in proceeds from collateral liquidated by the Defendant.  Defendant First Niagara Bank answered the Complaint and subsequently filed a Motion for Judgment on the pleadings, seeking dismissal of the Complaint.  Defendant also requested attorney fees and costs.  In response, the Trustee filed a Cross-Motion for Summary Judgment.

The question is whether a needlessly convoluted description of collateral in a succession of U.C.C. financing statements causes a claim of security to fail as "seriously misleading" under N.Y.  U.C.C. § 9-506.  Given the specific facts of this case, the claim of security is upheld.


INTRODUCTION

Since the 2001 revision of Article 9 of the Uniform Commercial Code ("U.C.C.") a "UCC-1" financing statement's description of collateral in New York need only say "all assets of the debtor" if indeed the security agreement adequately reaches all assets of the borrower.  (N.Y. U.C.C. § 9-504(2).)

---

[1]The Complaint seeks other forms of relief as well.  A § 544 cause of action will be rejected below.  Causes under §§ 542 and 549 will be rescheduled for further argument:  They relate to "involuntary gap" matters, and to unresolved questions about seized assets that might remain in the Bank's possession.  This Decision will address the §§ 544 and 547 causes only.

During 2005, 2006 and 2007, First Niagara Bank (the "Bank") loaned about $1.2 million to United Graphics, Inc.  That borrower's printing business was then located at 100 River Rock Drive in Buffalo, N.Y., and it is not disputed that the Bank properly took a <u>security interest</u> in all assets of that borrower.   (The borrower had no real estate and so no mortgage was necessary.)  Despite the fact that only the five words above were needed - - "all assets of the debtor" - -  the Bank's early <u>financing statements</u> (duly filed in the office of the N.Y. Secretary of State) described the collateral as:

*"All assets of the Debtor <u>including, but not limited to,</u> any and all equipment, fixtures, inventory, accounts, chattel paper, documents, instruments, investment property, general intangibles, letter-of-credit rights and deposit accounts now owned and hereafter acquired by Debtor and **<u>located at or relating to</u>** the operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York, <u>together with any products and proceeds thereof including but not limited to</u>, a certain Komori 628 P & L Ten Color Press and Heidelberg B20 Folder and Prism Print Management System."*  [My emphasis.]

The following recitation of events seems not to be in dispute.[2]  In 2012 the borrower changed its name to the Debtor's current name and moved to 6030 North Bailey Ave., Amherst, N.Y.  The Bank duly filed amended financing statements

---

[2]They are not "findings of fact" given that there has been no evidentiary hearing and no stipulation of facts.

reflecting the new name and address of the Debtor but did not change the collateral

description (even as to the Buffalo location of equipment) until 2013. It was in February

of that year that the Bank changed the collateral description as described below.

It seems that the loan was in default by that time, and that the Bank was

vigorously liquidating its collateral when this case was begun (on May 17, 2013) by one

or more creditors by means of an involuntary Chapter 7 petition that was not contested

by the Debtor. The Order for Relief was entered on June 12, 2013. The timing of the

change in the description of the collateral causes the Chapter 7 Trustee (represented

by duly-appointed Special Counsel who was counsel for the § 303 Petitioners) to allege

that the February 2013 financing statement should be avoided under 11 U.S.C. § 544

or § 547, and that monetary recoveries by the Bank before the preference period are

avoidable under § 544, while its recoveries within 90 days before May 17, 2013,

constituted 11 U.S.C. § 547 preferences that are avoidable.[3]

In the February, 2013 amended U.C.C. filing (sought to be set aside

under § 544 and § 547), the description was:

"All assets of the Debtor including, but not limited to, any and all

equipment, fixtures, inventory, accounts, chattel paper, documents, instruments,

investment property, general intangibles, letter-of-credit rights and deposit accounts

---

[3]This is not a Howard's Appliance type of case (874 F.2d 88 (2d Cir. 1989)). There was no wrongdoing by the Debtor here. (In the Howard's Appliance case the debtor moved from New York to New Jersey and did not promptly inform the lender. So the lender was not perfected in New Jersey. The Circuit ruled that that debtor's creditors should not benefit from the debtor's wrongdoing at the expense of its innocent floor-plan financier.)

now owned and hereafter acquired by Debtor, *including but not limited to those located at or used in connection with the business premises at 6030 N. Bailey Avenue, Amherst, N.Y.  14226,* together with any and all products and proceeds thereof." [My emphasis.]  (The Trustee agrees that that description would have been unassailable if it had been on file from the beginning.)

DISCUSSION

The Trustee asserts that hundreds of thousands of dollars collected by the Bank in loan payments, and eventually in proceeds from the liquidation of its collateral, must be turned over to the Chapter 7 Trustee for the benefit of <u>all</u> creditors. He argues that the earlier filings failed *ab initio* under N.Y. U.C.C. § 9-506, and that after the move they failed under N.Y. U.C.C. § 9-507.

He focuses too much on the "filings," however, and not enough on the fact of the grant of loans and the taking of liens in proper fashion, though the liens were not perfected "as against the world."  The Court sees no § 544 issue here even if the early <u>filings</u> were defective.  The Trustee asks "When the borrower was at River Rock, was the Bank perfected?"  "Even if it was," he asks, "did it lose perfection when the borrower moved?"  The Court answers that it makes no difference.  It appears that the borrowing is not disputed, and that the grant of the security interest is not avoidable under §§ 541, 544 or 548.  In some circumstances, § 547 avoidance of the act of perfecting the lien also negates the grant of the security <u>interest</u> itself retroactively

(such as if perfection is not accomplished within certain time restrictions as to certain types of transactions).  (See, for example, *Horwitz v. Rote (In re Moorhouse)*, 487 B.R. 151 (Bankr. W.D.N.Y. 2013).)  But if the <u>grant of the security interest</u> in this case is not avoidable (and indeed it has not been challenged), then only what the Bank received within the 90-day period would be subject to avoidance.

The Trustee offers an expert linguist's (a university professor's) interpretation of the language used in the earlier financing statements.[4]  The professor cogently describes two interpretations that are possible if one considers the words verbatim, and he declares that he considers them only without any background context as to any particular reader, or the context of the issue.  One interpretation favors the Bank, while   the other favors the Debtor's trade creditors.  Making it even clearer, in paragraph 20 of his Declaration,  the professor recognizes that whether a specific reader will adopt one interpretation rather than the other may depend upon that reader's age or background.  In paragraph 21 he disclaims giving any opinion as to whether speakers "familiar with legal texts would interpret the [language] in one way or the other, or if they would be undecided."  He notes, in paragraphs 22 and 23 of his Declaration, how the ambiguity could be easily resolved by using different words or combinations of words, or by "more judicious use of commas or hyphens."

---

[4]The Bank objects to this Court's consideration of the linguist's Declaration, but the Court's ruling moots that contest.

He was not retained to address the non-verbatim approach[5] that is the

"meat and potatoes" of interpretation of legal documents, of civil statutes, and even of

<u>criminal</u> statutes - - "paraphrasing" as a means to discern a plain and intended

meaning.[6]  Consequently he did not comment upon that approach.

A simple paraphrasing of the language in the UCC-1 here at issue

generates a clear and simple meaning.  It is obvious that the intended structure of the

language in question (the earlier collateral description) was this:

This lien "covers all assets of the Debtor, including X, Y and Z, located at

100 River Rock Drive, but the collateral is not limited to X, Y and Z."

And so as between the lender and the borrower a <u>full</u> **paraphrasing** of

the subject language would be:  "All assets of the Debtor including any and all

equipment, fixtures, inventory, accounts, chattel paper, documents, instruments,

investment property, general intangibles, letter-of-credit rights and deposit accounts

now owned and here-after acquired by Debtor and located at or relating to the

operation of the premises at 100 River Rock Drive, Suite 304, Buffalo, New York,

_____

[5]He was not hired to evaluate language that was <u>not</u> used in the UCC-1s.

[6] Another scholar has offered such a proposition in a different, but informative, context.  "If one believes as I do that judges when interpreting criminal statutes must always take such statutes to be directions to judges to sanction the behavior such statutes prohibit, and also believes that judges use standard deductive logic in applying such statutes to particular cases, then one is driven to the linguistic conclusion that all criminal statutes must be paraphrased into conditional statements with the operative facts in the antecedent clause and the description of the remedy in the consequent clause.  These systematic regimentations I would call part of linguistics, and the result of doing them, part of the ordinary or plain meaning of the statute in question."  Michael S. Moore, "Plain Meaning and Linguistics - - A Case Study," 73 Washington University Law Quarterly 1253(1995), in his "Conclusion."

together with any products and proceeds thereof including, but not limited to, a certain

Komori 628 P+L10 Color Press and Heidelberg B20 Folder and Prism Print

Management System, *but not limited to the enumerated assets.*" [Emphasis added.]

        The Court could simply accept the professor's stated observation that the

collateral description is "ambiguous." If so, then the Court is persuaded by the analysis

in *ProGrowth Bank, Inc. v. Wells Fargo Bank, N.A.,* 558 F.3d 809, 814 (8th Cir. 209),

and rejects the analysis set forth in the case of *In re I. P. Durbin, Inc.,* 46 B.R. 595

(Bankruptcy. S.D. Florida 1985). The statement in *Durbin* that *"It is not necessary that*

*any actual creditor be misled. Rather, consistent with 11 U.S.C. § 544, the Court must*

*consider whether a hypothetical creditor could have been misled* [my emphasis]" is far

too broad. There must be a degree of diligence. Whether the hypothetical

downstream creditor is a potential or actual lender, a potential or actual judgment lien

creditor, or a bankruptcy trustee, a court must presume a certain level of sophistication

or a certain level of intelligence and diligence in reading the collateral description in the

UCC-1 and in acting upon whatever notice it provides. Consider, for example, the fact

that most of the cases dealing with the adequacy of a the financing statement deal with

difficulties in pinning down the correct name of the borrower, and, thus, in searching

governmental indexes by name. For example, see *In re Strickland*, 94 B.R. 898, (Bank.

Ct., N.D.M.S. 1988), discussing the fact that a potential downstream lender often must

rely on a search of the U.C.C. index conducted by a deputy county clerk.[7]  Citing Mississippi law, the court stated that "even if a technically defective financing statement is deemed not to be 'not misleading,' it imparts inquiry notice even to creditors who rely on a report conducted by a searcher who <u>is</u> misled.  A financing statement cannot be misleading to some but not to others.  If a defective financing statement is not misleading, it imparts notice to the world."  In other words, the adequacy of the description of the collateral is not to be measured by the weakest link in the chain of name searchers.[8]

And consider *I.T.T. Commercial Finance Corporation v. Bank of the West*, 166 F.3d 295 (5th Cir. 1999), discussing a "reasonably prudent" subsequent creditor, and *Allied Mutual Insurance Company v. Mid Plains Waste Management*, 612 NW 2d 488 (Neb. Sup. Ct. 2000), to the effect that the test of substantial compliance with requirements for filing of a security interest is not whether a particular party was actually misled to their detriment by the irregularities in a financing statement, but whether or not a "<u>reasonably diligent</u> researcher" would be misled by the irregularity.

---

[7]Perhaps that is an unfair statement.  Perhaps it is the creativity of the marketplace that presses the limits of Article 9 of the U.C.C.  More and more companies use graphics in their names (e.g., +, @, *, %).  How a U.C.C. filing against such a debtor might be indexed and searched is beyond this writer's knowledge and experience, having been statutorily prohibited from the practice of law since entering public service in 1981.  (It is also possible that <u>automated</u> searches of U.C.C. filings are easiest when some graphic character is rare, but appears in a debtor's name.)

[8]That court's language is indeed a difficult passage to interpret because of the multiple negatives and the fact that it uses the words "misleading" and "defective" in a way that distinguishes them, rather than equates them.  It means this to this writer:  A searcher might be misled, but the financing statement's technical defects do not fail just because some particular searcher was misled.  The Court must decide whether the UCC-1 would have misled a searcher possessing a certain level of skill.

It seems to this Court that the Uniform Commercial Code cases consistently hold a prospective downstream creditor to a standard of "reasonableness" or "prudence" in searching for filings against a prospective debtor's <u>name</u>. The same standard should be applied in examining the <u>collateral description</u> once the searcher has found a UCC-1 pertaining to that debtor. Thus, the *Durbin* view that a collateral description is "seriously misleading" if "a hypothetical creditor could have been misled" is insufficiently restrained even when the matter is a 11 U.S.C. § 544 matter (meaning the hypothetical status of a bankruptcy trustee) rather than a dispute between an upstream secured creditor and an actual downstream secured creditor.

That requires greater focus. To the *Durbin* Court it seemed important that the contest was between the initial secured creditor and a "third party stranger such as a trustee in bankruptcy." The court stated that in such a contest "the greater burden shall fall on the party who drafted the documents." The Durbin Court cites no authority for that proposition in that context. It is possible, however, that this Court might agree with it under different facts. For example, if the only UCC-1 <u>ever</u> filed by this Bank as to this Debtor referenced an incorrect (or former) address as to the location of the collateral, one might see a meaningful question presented as to whether the collateral description was "seriously misleading" under N.Y. U.C.C. § 9-506.

In this case, however, there was a long succession of UCC-1s filed as to the material matters. All were public record. They set forth the name change, the address change, and the change in the description of the collateral. Assuming that a

"reasonable" or "prudent" search of the U.C.C. filings in the office of the Secretary of

State in Albany would have shown all (or many) of them, the inescapable conclusion is

that the hypothetical searcher learned of the lien and the re-location of the business

and of the collateral to the new address.[9]  Returning, then, to the *Pro Growth Bank*

Case, the articulation is that "where a description can reasonably be interpreted in one

of two ways - - one of which may cover the collateral at issue and one of which does

not - - notice filing has served its purpose."  (See also *In re D&L Equipment, Inc.,* 457

B.R. 616 (E.D. Michigan, 2011), *In re Manufacturers & Traders Trust Company v.*

*Brown*, 75 B.R. 704 (W.D.N.Y. 1987), and *In re Admor's Office World, Inc.,* 1992 Lexis

1811, all of which are to the effect that the purpose of notice filing is to indicate that a

creditor <u>may</u> have a security interest, thereby providing a <u>starting</u> point for the

prospective creditor in investigating whether assets of the prospective borrower or

other creditor are encumbered.)

       Although the *M & T v. Brown* case would be binding if on point (see *In re*

*Reid*, 237 B.R. 577 (Bankr. W.D.N.Y. 1999)), it is not on point because no bankruptcy

estate was involved there.  This Court reaches a similar conclusion upon similar facts,

however.  When Congress wishes to elevate a bankruptcy trustee to a status higher

than a "real" creditor, it does so explicitly.  For example, 11 U.S.C. § 544(a) not only

states that "The trustee shall have . . . the rights and powers of . . . a creditor . . . that

---

[9]The Debtor had no realty, as noted at the outset. That is why a lien as to "all assets of the debtor" did not require that the UCC-1 have been filed in the office of the local County Clerk.

obtains . . . a judicial lien . . . <u>whether or not such creditor exists</u>," (emphasis

supplied), but it also washes the trustee clean of "any knowledge" that an actual

creditor in this case had, or that a debtor had, that might have defeated someone else's

effort, rather than such trustee's[10] effort.

Consequently the Court sees no basis for setting the bar higher for a

secured creditor against a bankruptcy trustee when a borrower ends up here and the

issue is (as here) whether public records lack strength against a bankruptcy trustee.

(This case is only a § 547 case, not a fraud case.)

The Uniform Commercial Code does not grant a trustee a special status

or special view as to what constitutes "seriously misleading" under N.Y. U.C.C. § 9-506,

nor does the Bankruptcy Code.


CONCLUSION

The Court rules as follows:   Plaintiff's Cross-Motion for Summary

Judgment as to §§ 544 and 547 is denied.  Defendant's Motion for Judgment on the

pleadings is granted in those regards.  Defendant's request for attorney fees and costs

is denied.  Counsel shall appear before the Court on October 22, 2014 at 10:00 a.m. to

address any possible remaining issues.

SO ORDERED.

---

[10]For example, a mechanic lienor might have state law rights that prime construction-loan mortgagees or factors that failed properly to record their liens, but might lose that right if it had actual knowledge of the mortgagee's or factor's liens.

Dated:        Buffalo, New York
              October 3, 2014


                                              s/Michael J. Kaplan
                              _____
                                              U.S.B.J.